| | |
|---|---|
| L.L., individually and on behalf of E.R. a minor,<br><br>    Plaintiffs,<br><br>vs.<br><br>MEDCOST BENEFITS SERVICES, and the MOUNTAIN AREA HEALTH EDUCATION CENTER (MAHEC) MEDICAL and DENTAL CARE PLAN.<br><br>    Defendants. | AMENDED COMPLAINT |

   Plaintiff L.L. individually and on behalf of E.R. a minor, through her undersigned

counsel, complains and alleges against Defendants Medcost Benefits Services ("Medcost") and

the Mountain Area Health Education Center (MAHEC) Medical and Dental Care Plan ("the

Plan") as follows:

## **PARTIES, JURISDICTION AND VENUE**

1. L.L. and E.R. are natural persons residing in Buncombe County, North Carolina. L.L. is
   E.R.'s mother.

2. Medcost is an insurance company and was the third-party claims administrator.

3. As the third-party claims administrator for the Plan, at all relevant times Medcost \had
   discretionary authority and responsibility to administer the claims Plaintiff filed for the
   Plan to cover E.R.'s treatment. This included the discretionary authority to independently
   deny E.R.'s claims.

4. Medcost also had the authority to interpret eligibility for benefits when administering claims for the Plan.

5. This authority was demonstrated when Medcost repeatedly denied claims for treatment E.R. received, citing Plan provisions as its basis for doing so, then responded to appeals by upholding its own denials and advancing rationales for why its denials were justified.

6. Accordingly Medcost was a fiduciary, for purposes of ERISA, under the terms of the Plan.

7. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). L.L. was a participant in the Plan and E.R. was a beneficiary of the Plan at all relevant times. L.L. and E.R. continue to be participants and beneficiaries of the Plan.

8. E.R. received medical care and treatment at Change Academy Lake of the Ozarks ("CALO") from August 3, 2018, to July 19, 2019. CALO is a licensed residential treatment facility located in Missouri and provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. CALO specializes in the treatment of individuals suffering from attachment disorders.

9. Medcost denied claims for payment of E.R.'s medical expenses in connection with her treatment at CALO.

10. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

11. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because Medcost does business in Utah. In addition, venue in Utah will save the Plaintiff costs in litigating the

case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

12. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### E.R.'s Developmental History and Medical Background

13. E.R. was born in Moscow, Russia, and was abandoned at the hospital by her biological mother. E.R. was adopted by L.L. around the time that she was seven months old. E.R. was born with Hepatitis C antibodies, suggesting that her biological mother abused substances while pregnant with her. Nevertheless, E.R. did well in her early childhood and met her developmental milestones.

14. E.R. had attachment issues and she especially had difficulty with transitions. E.R. started receiving behavioral interventions around the time that she was in the first grade, but these attempts at therapy seemed to aggravate her symptoms rather than reduce them. E.R. became increasingly violent and would often attack her parents and destroy property. She started refusing to go to school. E.R. began to self-harm and also threatened to kill herself, stating, "I know how to do it."

15. E.R. started seeing a variety of therapists as well as psychiatrists. She started taking medications but they were only marginally effective. She was also sexually molested by her aunt's boyfriend, but hid this from L.L. Her fits of rage intensified as she grew older and she often threatened to jump out of the car while it was moving, and would even intentionally grab the steering wheel or gear shift and attempt to cause a collision.

16. L.L. had to hide the knives and sharp objects after E.R. threatened herself and her family with them. E.R. regularly had to be restrained for long periods of time. E.R. continued to act out aggressively and self-harm throughout elementary school and it only got worse as she got older. E.R. carved the words "I'm sorry" into her leg and attempted to hang herself after entering into a suicide pact with a girl online. L.L.'s anxiety became increasingly severe and she isolated herself as much as she could.

17. As other treatment interventions had failed and L.L. was having trouble keeping herself safe, E.R. was admitted to an inpatient wilderness program called Trails Carolina. E.R. did improve some in this setting, however, her primary therapist recommended additional treatment following her discharge from Trails.

18. E.R. was then transferred to a facility called Lakehouse Academy for Girls and it was again recommended that she continue to receive treatment. E.R. continued to see a therapist and a psychiatrist following her discharge, but her refusal to participate made treatment difficult and her therapy team stated that they would no longer be able to treat her.

19. E.R. continued to threaten suicide on a regular basis and to self-harm by carving messages into her skin. On multiple occasions, E.R. met with a crisis management team

to assess whether she needed to be hospitalized. E.R.'s treatment team recommended that she be admitted to CALO in order to treat her attachment disorders.

//

## CALO

20. E.R. was admitted to CALO on August 3, 2018.

21. The terms of the Plan provide that the Plan covers medically necessary mental health and/or substance use disorder treatment.

22. The terms of the Plan further provide that the Plan covers mental health treatment and/or substance use disorder treatment received at residential treatment facilities.

23. In a letter dated July 25, 2019, nearly an entire year after she was first admitted to CALO, Medcost denied payment for E.R.'s treatment. The letter gave the following justification for the denial:

> The provision in the Plan Document on which the denial is based is found on page 59 under the heading *Medical Plan Exclusions*. Under item 12, the language states:
>
> **Residential Treatment**. Residential treatment for Mental Health and Substance Use Disorders is not covered for the following:
> - The use of foster homes or halfway houses.
> - For wilderness center training.
> - For therapeutic boarding schools.
> - For custodial care, situation or environmental change.

24. On January 9, 2020, L.L. submitted a level one appeal of the denial of E.R.'s treatment. L.L. stated that she was entitled to certain protections under ERISA and that among other things, Medcost was required to take into account all of the information she provided, to utilize appropriately qualified reviewers and disclose their identities, to provide her with a full, fair, and thorough review of the denial, and to provide her with the information she needed to perfect the claim.

25. She wrote that Medcost had already fallen short of its ERISA obligations as it had not provided her with a copy of the denial and she had to get it from CALO. She quoted the adverse benefit determination section from her insurance policy and contended that the failure to provide her with a denial rationale violated the terms of the Plan as well.

26. In fact, L.L. included email correspondence with Medcost which stated that as of March 6, 2019, no denial letter had been generated, as it was not policy to draft a letter in the case of a facility type exclusion. The email also stated that the "average" length of stay at a residential treatment facility was 3.5 months, but E.R.'s treatment was planned to take place over 1-2 years. The email also clarified that Medcost had classified CALO as a therapeutic boarding school.

27. The email chain also showed that CALO had disputed this classification and had included a copy of its licensure as a residential treatment facility, yet Medcost continued to deny care on those grounds.

28. L.L. wrote that when she finally obtained a copy of the denial, Medcost had listed the incorrect dates of service and had provided her with little to no meaningful information as to why the treatment provided at CALO was excluded. She asked Medcost to explain why it had failed to comply with ERISA and the appeal procedures outlined in her insurance policy.

29. L.L. argued that the treatment provided at CALO was a covered benefit and it was not a therapeutic boarding school but was licensed by the State of Missouri as a residential treatment facility, met all of the strict requirements to maintain such a license, and was also accredited by The Joint Commission.

30. She wrote that CALO had clearly informed Medcost of the above facts, but Medcost continued to misclassify it as a non residential treatment facility. She contended that this claim was baseless and accused Medcost of ignoring evidence in the interest of protecting its bottom line. She noted that the claims for CALO had been submitted under revenue code "1001" which was exclusive to residential treatment, but Medcost had either ignored this code or otherwise failed to properly review the claims.

31. L.L. also referenced the assertion made in the email that the average length of stay in a residential treatment facility was only for a few months. L.L. contended that this was not accurate, and in any event, her insurance policy imposed no restrictions on the length of residential treatment care, therefore, the length of treatment was immaterial and should not have impacted the decision to approve or deny payment.

32. She requested in the event that Medcost upheld the denial that it provide her with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, the Plan's mental health, substance use, skilled nursing, inpatient rehabilitation, and hospice criteria, along with any reports or opinions from any physicians or other professionals regarding the claim (collectively the "Plan Documents").

33. In a letter dated April 20, 2020, Medcost upheld the denial of payment. The unidentified reviewer wrote in part:[1]

> Services were denied based on the exclusion in SPD; under Residential Treatment for therapeutic boarding schools.

---

[1] The reviewer's statement was originally in italics to differentiate it from the rest of the letter, but as these are not necessary here, they have been removed.

No. It is not medically necessary for this member to be inpatient for this amount of time in a residential treatment facility.

The available information does not support the medical necessity for the use of the RTC level of care. This is due to a lack of documentation of specific symptom severity that would require the use of 24 hour a day monitoring, observation and treatment. The patient has a chronic history of behavioral difficulties, mood dysregulation, and temper outbursts, but at the time of admission there was no evidence of severity related to thoughts or behaviors related self-harm, [sic] no severe aggression, and no severity of mood requiring 24 hour a day care. In addition, there is no evidence of acute deterioration of functioning that would require the intensive use of 24 hour a day resources for chronic management and care. Therefore, the use of the RTC level of care was excessive for the patient's documented presentation and was outside the standard of care.

34. The letter then stated that CALO met the criteria for a residential treatment center and "provides all of the care expected of a residential facility."

35. L.L. was informed she had the right to appeal the adverse decision and was entitled to reasonable access to "all documents, records, and other information relevant to the review of this request."

36. On October 9, 2020, L.L. submitted a second appeal for the denial of E.R.'s treatment.[2] L.L. expressed alarm that Medcost appeared to have abandoned its previous denial rationale entirely and replaced it with a new reason which bore no relation to the initial denial. L.L. contended that this was an attempt to deprive her of her appeal rights by engaging in a "trial run" of denials and was done intentionally to obscure Medcost's true justification for denying care.

---

[2] The insurance policy only appears to offer one level of internal appeal. However, as noted above in the April 20, 2020, denial, the reviewer explicitly informed L.L. that she was able to appeal the denial. In addition, L.L. stated that she was entitled to another appeal to address Medcost's changed denial rationale, also, Medcost did not at any point during the prelitigation appeal process contend that the Plaintiffs had no right to a second appeal, and finally, as noted below, Medcost accepted and reviewed this appeal out of "courtesy".

37. She wrote that Medcost had shirked its fiduciary duty and had failed to abide by its responsibilities under ERISA which guaranteed, among other things, that she be granted a "full, fair, and thorough" review and be given "a reasonable opportunity to respond" to any new or additional denial rationales.

38. L.L. included letters of medical necessity with the appeal. In an undated letter Katie Ford, MS, NCC, LCMHC wrote in part:

> Due to the client's refusal to engage in Psychiatry appointments, her disengagement in individual and family therapy, and the increase in self-sabotage and significant safety concerns at home, it became very clear that it was medically necessary for the client to receive a more intensive therapeutic intervention that a residential treatment center could provide. Given that the client had been to a wilderness therapy program and a therapeutic boarding school previously, it was imperative that this residential treatment center employed clinicians that were experts in attachment disorders, and set up their milieu in a way that was conducive to teenagers with attachment related struggles. It was my clinical opinion that a residential treatment center that was not adept in working with teenagers with attachment disorders, and employed a more behavioral approach, would potentially create more harm and breaks in the client's attachment with her family. Consequently, a residential level of care, with significant knowledge and proven success in treating adolescents with attachment disorders, was medically necessary to achieve significant and lasting improvement, as well as to ensure continued safety.

Amber Kilkenny, LCSW, wrote in part in an undated letter:

> As the primary therapist working with [E.R.] from 4/30/14 to 5/17/16 and again from 4/25/18 to 7/20/18, It is my clinical opinion that [E.R.] needed to transition to a clinically sophisticated Residential Treatment Center that could work with Attachment Disorders and keep her physically safe. [E.R.] has an Attachment Disorder that cause [sic] her emotional, interpersonal and behavioral challenges that caused her to be treatment resistant in out patient [sic] therapy, suicidal and physically, verbally and emotionally abusive in her home. [E.R.]'s parents have went [sic] to great lengths to meet her clinical needs through individual outpatient therapy from a young age, intensive family therapy and medication management.
>
> Despite weekly trauma focused therapy in conjunction with medication management and family therapy in May of 2016 it became clear that [E.R.]'s self harm episodes, suicidal ideation and physically aggressive behaviors in the home could not be safely managed through outpatient interventions. I recommended that [E.R.] transition to a wilderness therapy program, parents choose [sic] Trails

Carolina who later recommended she transition to a therapeutic boarding school. Following [E.R.]'s time at Lake House Academy I began seeing her again in April of 2018. Initially [E.R.] seemed invested but over time she began to refuse to come or engage in sessions. By June of 2018 the self harm & suicidal ideation became more consistent and Mobile Crisis was required to assess her safety and I recommended [E.R.] transition again to a specialized Residential Treatment Center that works with Attachment Disorders to keep her safe.

39. L.L. argued that Reactive Attachment Disorder was a notoriously difficult condition to treat and required a very specific type of therapeutic treatment. She pointed out that the reviewer had cited to literature concerning the treatment of depressive disorder as one of two documents that influenced the decision to deny care,[3] and asked what bearing this had on E.R. who had a primary diagnosis of Reactive Attachment Disorder.

40. L.L. included research from the American Academy of Child and Adolescent Psychiatry on the nature of Reactive Attachment Disorder as well as an academic research article from the Journal of Family Violence. She stated that it was only in a long-term residential treatment program like CALO that E.R.'s extensive trauma and complex mental health conditions could be treated, as evidenced by the failure of treatment at other levels of care.

41. L.L. also expressed concern about the MCG guidelines referenced by the reviewer. She cited to the court decision in *Wit et.al., v United Behavioral Health* in which the court found the proprietary guidelines of another insurer to violate generally accepted standards of medical practice by, among other things: using a list of mandatory prerequisites to evaluate the medical necessity of care, overemphasizing acuity and crisis stabilization over effective treatment of the underlying condition, failing to address comorbid

---

[3] The other being MCG guidelines for residential treatment care.

symptoms, and pushing patients to a lower level of care regardless of whether such treatment was safe or effective.

42.  L.L. alleged that Medcost's criteria were similarly problematic to those the court had found to be impermissible in *Wit*. She further contended that, "MCG knowingly and intentionally created guidelines for evaluating residential treatment services that improperly heighten the relevance of acute behavioral health symptoms and conditions, while minimizing the relevance of non-acute behavioral health symptoms."

43. L.L. wrote that MCG was deliberately "raising the acuity bar" for residential treatment, by knowingly provided insurers with overly restrictive criteria which violated generally accepted standards of medical practice. She argued that these criteria allowed insurers to plausibly deny claims for treatment which otherwise would have been approved, and let insurers protect their financial bottom lines at the expense of their clients.

44. L.L. pointed out that the reviewer had referenced factors such as a lack of acute deterioration as a justification to deny care. She stated that no such requirement was present in her insurance policy, nor could E.R. be safely treated at a subacute facility such as CALO if she had been suffering from acute symptoms, as CALO was not "expected to treat or equipped to handle patients at risk of acute dangerousness." She argued that patients needing acute level care should be treated in a hospital setting, not a residential treatment center.

45. L.L. asked Medcost to perform a MHPAEA compliance analysis of the terms of the Plan and asked to be provided with physical copies of any and all documentation related to this analysis. She stated that she had attempted to access Medcost's criteria for skilled nursing, inpatient rehabilitation, and inpatient hospice care –in order to investigate

whether Medcost used similarly restrictive criteria for medical benefits which were analogous to the mental healthcare E.R. received– but she was unable to access these criteria and was, consequently, unable to verify Medcost's level of MHPAEA compliance. L.L. asked Medcost to provide her with these documents.

46. L.L. argued that inasmuch as these criteria violated generally accepted standards of medical practice as well as federal law, the use of such criteria was unethical. She asked Medcost to rely on her insurance policy's definition of medical necessity which had no such requirements rather than any other proprietary guidelines.

47. L.L. again requested a copy of the Plan Documents and stated that these items were essential for her to assess Medcost's level of compliance with MHPAEA. She asked that if Medcost was not in possession of these documents or was not acting on behalf of the Plan Administrator in this regard that it forward her request to the appropriate entity.

48. In a letter dated December 18, 2020, Medcost stated that it had upheld the denial of benefits. Medcost stated that the Plaintiffs' previous appeal was reviewed out of courtesy, but it did not meet the definition of an appeal. The letter stated that appeals needed to be directed to the Plan or Claims administrator and needed to be sent within 180 days of the adverse benefit determination. The Plaintiffs' appeals met these criteria, so it is unclear why Medcost denied under these grounds. The letter offers no further justification as to why the denial was maintained.

49. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

50. The denial of benefits for E.R.'s treatment was a breach of contract and caused L.L. to incur medical expenses that should have been paid by the Plan in an amount totaling over $210,000.

51. Medcost failed to conduct a MHPAEA analysis or to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of L.L.'s requests.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

52. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Medcost, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

53. Medcost and the Plan failed to provide coverage for E.R.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders at residential treatment facilities.

54. The summary plan description ("SPD") states in part under the heading Notification of Adverse Benefit Determination: "The Claims Administrator shall provide a Covered person with written or electronic notification of any adverse benefit determination." Under the heading Post-Service Claim the SPD states in part: "For post-service claims, generally the Claims Administrator will notify the Covered Person within a reasonable

period of time, but not later than 30 days from receipt of the claim at the initial level."

55. L.L. argued that Medcost failed to abide by its responsibilities under ERISA and the SPD. She stated that she was not provided with an initial denial letter and had to reach out to CALO to obtain one.

56. She also included email correspondence with a Medcost representative which stated that the failure to produce a denial letter was not inadvertent but was policy in the case of a facility exclusion. Neither the SPD nor ERISA allow for such an exception.

57. ERISA, 29 U.S.C. §1133(2), also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process.

58. The denial letters produced by Medcost do little to elucidate whether Medcost conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Medcost failed to substantively respond to the issues presented in L.L.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

59. In fact, Medcost's level one reviewer explicitly contradicted its initial justification for denying care and correctly stated that CALO is a licensed residential treatment facility. In addition, Medcost's final denial does not address any of the arguments raised in the appeal process and gives little reason to believe that a comprehensive review was performed by a qualified reviewer even though L.L. specifically identified her right to that under ERISA.

60. Medcost and the agents of the Plan breached their fiduciary duties to E.R. when they

failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in E.R.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of E.R.'s claims.

61. The actions of Medcost and the Plan in failing to provide coverage for E.R.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

62. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Medcost's fiduciary duties.

63. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

64. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

65. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a

lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

66. The medical necessity criteria and analysis used by Medcost for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

67. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for E.R.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

68. For none of these types of treatment does Medcost exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

69. For example, Medcost limits coverage for residential treatment benefits to only a short-term stay, with "30-90 days" as the typical approved length of stay.

70. Medcost does not limit treatment received at skilled nursing, inpatient rehabilitation, or inpatient hospice facilities to a short-term stay.

71. This violates MHPAEA because Medcost limits residential treatment to a short-term stay, but does not place the same limitation on analogous medical/surgical treatment.

72. To this point, L.L. produced an email chain in which the Medcost reviewer specifically

referenced the length of E.R.'s treatment as problematic. L.L. took issue with this and stated that the SPD disclosed no such limitation. It is apparent from the email chain L.L. provided however that Medcost has internal policies to limit the length of residential treatment care. L.L. requested documents which would have allowed her to verify this but Medcost failed or refused to provide them. Medcost does not limit the availability of medical or surgical care in this way.[4]

73. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Medcost, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

74. For another example, internal communications produced by Medcost provide that it is Medcost's policy to cover treatment received at residential treatment facilities only if those facilities meet Medcost's "criteria for hospitals."

75. Medcost does not refuse to cover treatment received at skilled nursing facilities if those facilities do not meet its criteria for "hospitals."

76. Medcost does not refuse to cover treatment received at inpatient rehabilitation facilities if those facilities do not meet its criteria for "hospitals."

---

[4] Medcost does impose a yearly cap on some medical or surgical services. For example, skilled nursing care is limited to 100 days per calendar year. However, these restrictions are disclosed as limitations to coverage in the Plan documents. Additionally, short-term stay restrictions are not disclosed in the Plan documents

77. Medcost does not refuse to cover treatment received at inpatient hospice facilities if those facilities do not meet its criteria for "hospitals."

78. This violates MHPAEA because Medcost places a limitation on mental health and substance use disorder treatment received at residential treatment facilities (i.e., the requirement that the criteria for hospitals be met) which it does not place on analogous medical/surgical treatment.

79. For another example, when Medcost and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

80. Medcost and the Plan evaluated E.R.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

81. Medcost's denials offer little justification for the decision to deny care. However, it is apparent from the sparse information provided that Medcost's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that E.R. received. Medcost's improper use of acute inpatient medical necessity criteria is revealed in the statements in Medcost's denial letters such as "there is no evidence of acute deterioration of functioning." In addition, Medcost cites to acute factors such as a lack of self-harm and severe aggression as supporting its decision to deny payment.

82. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that E.R.

received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

83. The use of acute criteria was done deliberately by Medcost so that it could plausibly deny payment for mental healthcare by relying on guidelines expressly drafted for this purpose in order to minimize payouts of benefits to Plan participants and beneficiaries.

84. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

85. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

86. Medcost and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Medcost and the Plan were not in compliance with MHPAEA.

87. The violations of MHPAEA by Medcost and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

88. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for E.R.'s medically necessary treatment at CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs'

        Second Cause of Action;

3.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

        DATED this 8th day of February, 2022

                                                    By     s/ Brian S. King
                                                           Brian S. King
                                                           Attorney for Plaintiff

County of Plaintiffs' Residence:
Buncombe County, North Carolina.